# 2007 DTA 126

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN Y HUMACAO**
**PANEL V**

JESÚS M. MOLINA ESTRADA, VIVIAN M. AGOSTINI ORTIZ
Recurridos

v.

JOSÉ R. RAMOS ORTIZ
Recurrente

Núm. KLRA-2007-00586

San Juan, Puerto Rico, a 7 de noviembre de 2007

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Salas Soler y la Juez Velázquez Cajigas

Arbona Lago, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

**Hechos**

El 12 de julio de 2004, el Sr. Jesús M. Molina Estrada y su esposa, la Sra. Vivian M. Agostini Ortiz (matrimonio Molina-Agostini), otorgaron un *"Contrato de Servicios de Construcción"* (contrato original) con el Sr. José Ramos Cruz (Sr. Ramos), mediante el cual este último se obligó a realizar la remodelación de una estructura residencial propiedad de los primeros, sita en la Urb. Villa Carolina en Carolina, P.R. La obra conllevaría la demolición y construcción de gran parte del techo del inmueble, entre otras mejoras. ▪

En el contrato original se acordó que la construcción se realizaría en el término de mes y medio a dos meses y por el precio de $30,000.00. (Ap., Alegato de los recurridos, págs. 2-3.) Los $30,000.00 serían desembolsados en tres plazos, el primero de $10,000.00, el segundo de $12,000.00 y el último de $8,000.00 al finalizar la obra. (Ap., Alegato de los recurridos, pág. 3.)

Con el propósito de financiar la construcción de las mejoras, el matrimonio Molina-Agostini obtuvo de Doral Financial Corporation (Doral) un préstamo por la suma principal de $122,724.00, partida que quedó garantizada con una hipoteca sobre la aludida propiedad.

El 14 de julio de 2004, el matrimonio Molina-Agostini y el contratista Sr. Ramos suscribieron junto a Doral un *"Contrato de Construcción y Relevo de Responsabilidad"* (contrato modificado) (Ap., Recurso de Revisión, págs. 4-6.), cuya lectura revela las siguientes cláusulas aquí relevantes, a saber:

*"(........)*

*CLAUSULAS*

*1. El CONTRATISTA* (Sr. Ramos) *se obliga a construir en la residencia y/o la PROPIEDAD, las mejoras que se describe en el ANEJO B.* (Cabe aquí señalar que el antes referido primer contrato fue incorporado en el segundo contrato como Anejo B.)

*2. La referida estructura se construirá por Etapas. El CONTRATISTA se obliga a construir lo especificado en cada Etapa y el PROPIETARIO, del préstamo concedido por el BANCO, pagará al CONTRATISTA según éste haya concluido cada Etapa. Las cantidades y responsabilidades fijadas en cada Etapa se describen en el ANEJO C.* (Como Anejo C se incluyó un documento en el que se divide la ejecución de la obra en cuatro

etapas, particularizando las partidas a ser desembolsadas al culminar cada fase hasta una aportación total al cierre de $35,000.00. (*Id.*, a la pág.9.)

3. ...

4. ...

5. ...

6. ...

7. ...

*8. El CONTRATISTA se obliga con el PROPIETARIO y con el BANCO a comenzar la obra dentro de TRES semanas de la fecha de cierre del préstamo hipotecario y terminar la misma en 240 días a partir de la fecha de comienzo de la obra, salvo que ocurra alguna causa justificada o fuerza mayor o influencia del tiempo que aplace este término. (...).*

*9. Asimismo, el CONTRATISTA se obliga a construir cada Etapa, según lo pactado, y en caso de incumplimiento, el PROPIETARIO y/o el BANCO podrán, a su opción, proceder contra el CONTRATISTA para recobrar la totalidad del dinero desembolsado hasta entonces, más las costas, gastos y honorarios de abogados en que se incurra."*

(Ap., Recurso de Revisión, págs. 4-5.)

Asimismo, mediante las cláusulas 3 y 6 del contrato modificado se acordó que Doral sería el depositario de los fondos obtenidos mediante el contrato de préstamo hipotecario y estaría encargado de efectuar los pagos al contratista tan pronto como un inspector asignado por el banco verificare que se hubiese concluido y aprobado cada etapa de la construcción por el propietario. *Ibid.*

La construcción inició el 2 de agosto de 2004. Para el mes de octubre de 2004 se había pagado al Sr. Ramos la suma de $22,000.00 del precio total pactado y se había completado la construcción del techo. Así las cosas, el 30 de octubre de 2004, el Sr. Ramos solicitó al matrimonio Molina-Agostini un adelanto de $4,000.00 para sufragar ciertas deudas habidas con suplidores y materialistas y continuar con la construcción de las mejoras que faltaban. El matrimonio Molina-Agostini no accedió y el Sr. Ramos procedió a paralizar la obra.

Ante esta situación, el matrimonio Molina-Agostini reclamó en diversas ocasiones al contratista la corrección de ciertos defectos de construcción entonces detectados en lo ya construido en la residencia y la culminación de los trabajos de construcción. Dichas gestiones no rindieron fruto alguno.

El 10 de noviembre de 2004, el matrimonio Molina-Agostini presentó ante el Departamento de Asuntos del Consumidor (DACO) la querella 100026223, en contra del Sr. Ramos por incumplimiento de contrato y, además, en reclamo de *quántum* reparador. En lo aquí pertinente, alegó que la residencia manifestaba problemas de filtración de agua por el techo, desagües mal colocados, se destruyó pared del pasillo que estaba enchapada, no se completó el trabajo eléctrico que fue contratado, no se recogieron los escombros, no se protegieron los gabinetes de la cocina antes de iniciar los trabajos. (Ap., Recurso de Revisión, págs. 11-12.)

El 24 de junio de 2005 compareció por segunda vez un inspector del DACO a la obra, estando presentes el matrimonio Molina-Agostini y el contratista, Sr. Ramos. El 12 de julio de 2005, el inspector rindió su "*Informe de investigación*", en el que señaló una serie de defectos de construcción e incumplimiento y tasó en $16,400.00

el costo de la reparación de los vicios hallados, según fuera estimada en el primer informe de inspección.

Celebrada la vista administrativa el 31 de enero de 2007, notificada el 8 de febrero de igual año, el DACO emitió Resolución declarando con lugar la querella. El foro recurrido encontró probado que:

*"las Partes suscribieron un Contrato de Relevo* (segundo contrato) *con Doral. Mediante el mismo se hizo formar parte de la contratación el pacto habido entre los Querellantes y el Querellado, Sr. Ramos Cruz. Por lo que se obligaron específicamente a lo pactado en el Contrato de Construcción* (primer contrato). *Dicho contrato establece un término para la terminación de la obra de no más de dos meses. A su vez establece la forma de pago entre los Querellantes y el Querellado, Sr. Ramos Cruz. Al abandonar la obra casi tres meses luego de comenzada, el Querellado había recibido de mano de los Querellantes la suma de $22,000.00. Sin embargo, aun cuando los dos meses para la entrega del trabajo había[n] transcurrido, el querellado, Sr. Ramos Cruz solicitó el pago de $4,000.00 para continuar con los trabajos contratados. Ello significaba la mitad del balance de liquidación de la obra cuya cantidad total fue pactada en $30,000.00 según surge del Contrato de Construcción. A dicha fecha el querellado, Sr. Ramos Cruz no había terminado la obra y la misma estaba sustancialmente incompleta.*

*(...) Que conforme al testimonio del Ing. Batista* (inspector del DACO) *al momento de abandonar la obra, el Querellado, Sr. Ramos Cruz dejó trabajos pendientes por realizar que suman a $15, 733.78. Visto el estado de la obra al momento de ser abandonada por el Querellado, éste no tenía derecho a solicitar el pago final como condición para terminar la obra. Por lo que es forzoso concluir que éste abandonó la obra sin causa justificada e incumplió con los términos del contrato."* (Ap., Recurso de Revisión, pág. 42.)

Así, DACO aplicó la cláusula 9 del contrato modificado y ordenó al contratista a restituir al matrimonio Molina-Agostini los $22,000.00 que ya habían sido desembolsados para la etapa de la obra ya construida. Asimismo, condenó al Sr. Ramos a pagar a los recurridos la cantidad de $6,350.00 por concepto de daños sufridos por estos últimos, al tener que extender el alquiler de una vivienda secundaria por un término que no había sido previsto; $1,000.00 por concepto de angustias mentales y $2,000.00 en honorarios de abogado.

De tal determinación, el Sr. Ramos solicitó reconsideración. Alegó por primera vez ante el foro recurrido que el aquí denominado contrato modificado constituyó una novación al contrato original suscrito entre las partes el 12 de julio de 2004, puesto que modificó el precio de $30,000.00 a $35,000.00 y el período de ejecución de la obra de 2 meses a 240 días. Adujo, por tanto, que no se encontraba en mora cuando el matrimonio Molina-Agostini determinó paralizar la obra. DACO acogió dicha solicitud. El matrimonio Molina-Agostini presentó oposición y el 17 de mayo de 2007, notificada el 21 de igual mes y año, DACO emitió resolución en reconsideración, declarando no ha lugar dicha moción por lo que se mantuvo en vigor y efecto la Resolución de 31 de enero de 2007.

No conforme, el 20 de junio de 2007, el Sr. Ramos acudió ante este foro de apelación intermedia vía la Revisión Administrativa del epígrafe e imputa al DACO incidir de la siguiente forma:

*"A. ERRO EL HONORABLE DACO AL DECLARAR HA LUGAR LA QUERELLA RADICADA POR LA PARTE APELADA* [.]

*B. ERRO EL HONORABLE DACO AL ESTIMAR LOS DAÑOS* [.]"

El 31 de agosto de 2007, el matrimonio Molina-Agostini compareció y presentó su alegato. La causa está sometida y con el beneficio de los escritos de las partes procedemos a resolver.

**Exposición y Análisis**

El primer señalamiento de error se desdobla en dos planteamientos principales, a saber: *"(1) novación del contrato; y (2) abandono de la obra."*

**(A)**

En cuanto al primer planteamiento, el recurrente argumenta que el DACO incidió al concluir que los términos del contrato original habido entre las partes no fueron modificados por el segundo documento y que este último era simplemente un relevo bancario y no un contrato modificado.

Como se sabe, el término novación se define como *"la sustitución o cambio de una obligación por otra posterior, que modifica o extingue la primera, ya variando su objeto o condiciones principales, o bien sustituyendo la persona del deudor, o subrogando a un tercero en los derechos del acreedor"*. VIII J. Manresa y Navarro, *Comentarios al Código Civil Español*, págs. 855-856 (1967).

En nuestro ordenamiento sustantivo convergen dos (2) modalidades de la novación, la extintiva y la modificativa. La extintiva crea una nueva contratación incompatible con la anterior, por motivo de cambio radical en la naturaleza de la nueva obligación *vis a vis* la antigua. No pueden coexistir por resultar mutuamente excluyentes. La segunda impedirá el cumplimiento de la primera obligación. Por otro lado la meramente modificativa sólo altera una condición del contrato que no desnaturaliza el acuerdo y, por tanto, el contrato original persiste. *G. & J., Inc. v. Doré Rice Mill, Inc.*, 108 DPR 89 (1978).

La novación modificativa permite la coexistencia de dos (2) obligaciones sucesivamente contraídas. Aunque ello es una cuestión de intención, la misma *"debe inferirse de las circunstancias que rodean cada caso en particular"*. *Warner Lambert Co. v. Tribunal Superior,* 101 DPR 378, 389 (1973); *Constructora Bauzá v. García López*, 129 DPR 579, 599 (1992).

Se han establecido las siguientes pautas interpretativas con relación a esta figura jurídica: (1) la novación nunca se presume y ha de ser acreditada sin género alguno de duda; (2) que la novación es siempre cuestión de intención y que ésta debe inferirse de las circunstancias que rodean cada caso en particular; (3) que la doctrina puntualiza el elemento de la voluntad de las partes como determinante de la novación; y (4) que la extinción de las obligaciones conlleva la extinción de las garantías y demás derechos accesorios. Resulta evidente que una consecuencia tan drástica como ésta sólo puede producirse cuando las partes han tenido clara conciencia de ello. *Constructora Bauzá Inc. v. García López, supra,* citando a *Warner Lambert Co. v. Tribunal Superior, supra.*

De la concatenación de eventos antes reseñados surge que para el 12 de julio de 2004 el matrimonio Molina-Agostini y el Sr. Ramos suscribieron un contrato de construcción en el que se pactó que la obra se culminaría entre mes y medio y dos meses plazo, a un costo de $30,000.00. Posteriormente, el 14 de julio de 2004, las partes suscribieron, junto a Doral, un *"Contrato de Construcción y Relevo de Responsabilidad"* al cual se incorporó el contrato original como Anejo B. Ese segundo documento atendía también los aspectos de término de ejecución de la obra y precio, disponiéndose un plazo de 240 días para culminar la construcción y un precio de $35,000.00. Resulta evidente que la obligación original entre los aquí litigantes sólo sufrió una novación modificativa, por lo que no novó la anterior. Sólo la modificó en aspectos secundarios del acuerdo.

DACO y el matrimonio Molina-Agostini se equivocan al señalar que la obligación original no sufrió novación alguna. Nos invitan a concluir que el contrato modificador que firma el 14 de julio de 2004 Doral, que a su vez es el financiador de la obra, es espurio y realmente no altera el contrato original, cuando la realidad es distinta, porque el segundo acuerdo hace parte integrante al primero. Para concluir lo anterior tendríamos también que concluir que el contratista y dueño de la obra se confabularon para defalcar al Banco en la otorgación del préstamo, lo que no surge de autos y también constituiría delito.

Cabe señalar, además, que el propio foro recurrido se desdice cuando califica al contrato modificador como un mero relevo bancario, a la vez que accesa a la cláusula 9 del contrato enmendado para poner en vigor su cláusula penal. Si hubiera sido un simple relevo a favor de Doral, dicha cláusula penal no tendría relevancia alguna en el litigio entre dueño de obra y contratista, puesto que el banco no es parte ni puede serlo ante el foro administrativo de DACO. Doral no es un consumidor al amparo de la Ley habilitadora de DACO y cae fuera de la jurisdicción estatutaria de la agencia. Obviamente, se trata de una modificación del contrato original entre las partes ante el DACO.

A la luz de la normativa antes expuesta y ante los hechos que informa esta causa, debemos concluir que DACO erró al no determinar que lo que verdaderamente ocurrió fue una **novación modificativa** de la obligación original. Así, debemos también concluir que el exceso de $30,000.00 al precio de la construcción, es decir la suma de $5,000.00, para arribar al préstamo de $35,000.00 para la construcción, se trata de monto de préstamo utilizable en otros costos de la obra no contratados con el contratista, tales como permiso de construcción, planos, póliza FSE, arbitrios municipales, inspecciones del tasador, permiso de uso, entre otras gestiones que pudieran sobrepasar la suma de $5,000.00, no se trata de que contratista y dueño de obra se confabularan para hacerle creer al Banco que el contrato de obra era de $35,000.00, cuando en realidad era de $30,000.00. Se cometió el error levantado.

**(B)**

Respecto al segundo planteamiento, el recurrente sostiene que DACO erró al concluir que éste abandonó injustificadamente la obra. El Sr. Ramos arguye a su favor que al momento en que el matrimonio Molina-Agostini se negó a pagarle el adelanto de $4,000.00, ya el inspector asignado por el banco había emitido una certificación en la que indicaba que la obra estaba sustancialmente finalizada, por lo que recomendaba al banco el desembolso de los restantes fondos. Ante ello, el Sr. Ramos alega que *"la parte querellante pretendía que la parte querellada adquiriera los materiales de la obra con sus propios fondos, a pesar que el querellante recibió $122,724.00 de Doral Financial para esos propósitos y luego de que lo llamó "un negro sucio."* (Énfasis en el original.) No le asiste la razón.

Como cuestión de umbral debemos señalar que conforme lo convenido en el contrato enmendado las inspecciones realizadas por el inspector del banco era a los únicos fines de *"ser testigo ocular del cumplimiento de cada Etapa"* y poder recomendar al banco el desembolso de la partida correspondiente. En ningún momento tal inspección se haría a los fines de certificar la calidad de la construcción, *vis-a-vis* las especificaciones convenidas.

Asimismo, precisa aquí indicar que mediante su testimonio en la audiencia administrativa, el propio inspector del banco aclaró que para finales de octubre de 2004 certificó que la obra estaba sustancialmente terminada, pues desconocía los pormenores del contrato entre las partes y el hecho de que los trabajos de construcción iban más allá de los arreglos al techo de la propiedad. Puntualizó que de haberlo sabido, no *"hubiese recomendado a Doral el desembolso del dinero y no hubiera concluido que la obra estaba sustancialmente terminada."* (Det. de Hechos núm. 18, Ap. Recurso de Revisión, págs. 41-42.)

Asimismo, la evidencia desfilada y creída por DACO demostró que al momento en que se *"paraliza"* la obra ya se le habían pagado al contratista $22,000.00 de los $30,000.00 acordados y aún faltaban múltiples mejoras por realizar, por lo que el foro recurrido determinó que condicionar la culminación de la obra al desembolso de un adelanto de $4,000.00 no era justificado. El recurrente no presenta ante nos datos contundentes que impugnen la prueba aquí referida y que demuestren que el DACO incidió al concluir que el Sr. Ramos abandonó la obra injustificadamente e incumplió con el contrato.

En tal sentido, entendemos que la determinación formulada por el DACO no fue una arbitraria, irrazonable o ilegal, que requiera de nuestra intervención para corregir el criterio de la agencia por el nuestro. Por lo tanto,

confirmamos la determinación recurrida por entender que la misma es correcta en derecho. No se cometió el error aquí apuntado.

Considerada la cláusula 9 del contrato enmendado como lo que realmente es, una cláusula penal, *WRC Props, Inc. v. Santana*, 116 DPR 127 (1985); *Jack's Beach Resort, Inc. v. Comapañía de Turismo de P.R.*, 112 DPR 344 (1982), la entendemos aplicada en forma excesiva. Aunque el abandono de la obra no estaba justificado por razón de que bajo el contrato de obra el dueño no venía obligado a adelantar los $4,000.00 que el contratista le solicitó para comparar materiales, discrepancia que causó el abandono de la obra por pare del contratista, la penalidad impuesta por DACO, equivalente a la devolución de los $22,000.00 de obra allí construidos, no guarda relación proporcional a la violación imputada. Es aquí de recordar que cuando ello ocurre el contratista ya había concluido más del 73% de la obra contratada. Por tanto, reducimos dicha cantidad al 50% de la partida que quedaba por construir que eran $8,000.00, es decir, a $4,000.00 ($8,000 x .50= $4,000.00).

## II

En el segundo señalamiento, el recurrente imputa error al foro administrativo al estimar los daños.

Respecto a la restitución de la partida de $22,000.00 como penalidad ante el incumplimiento del contrato, ya expusimos al efecto, por lo que no es necesario aquí repetirlo.

Ahora bien, en vista de que concluimos que mediante la novación modificativa del contrato el término de ejecución original de la obra varió de 2 meses a 240 días, (lo que es igual, a 8 meses) procede modificar la partida de $6,350.00 concedida por concepto de daños, al tener que extender el alquiler de una propiedad por un plazo no previsto. Como la obra inició el 2 de agosto de 2004 y estaba supuesta a culminar en o antes de 240 días, hasta el 2 de abril de 2005 y no hasta el 2 de octubre de 2004, como lo había calculado el matrimonio Molina-Agostini y adjudicado DACO. Por tanto, el pago del canon de $450.00 mensuales correspondiente a los meses de noviembre de 2004 a abril de 2005, inclusive (6 meses), es decir, $2,700.00 ($450.00 x 6 meses = $2,700.00), es de la entera responsabilidad del matrimonio Molina-Agostini y procede reducirlo de la partida de $6,350.00 concedida en daños para finalmente otorgar $3,650.00 en dicho concepto ($6,350 − 2,700 = $3,650.00).

En cuanto a las partidas concedidas por concepto de angustias mentales y honorarios de abogado, el recurrente se limitó a argumentar de forma general y conclusoria que las mismas *"son sumamente exagerad[a]s y opresiv[a]s para la parte Apelante en el caso de epígrafe."* (Escrito de Revisión, pág. 8.) Por lo tanto, realmente estamos ante un señalamiento de un error levantado, pero **no discutido adecuadamente**, por lo que se entiende renunciado. La mera alegación de un error, que luego no se fundamenta o discute, no debe ser motivo para revisar, modificar o de alguna manera cambiar una decisión de un tribunal o foro administrativo. *Romero v. E.L.A.*, 169 DPR___ (2006), **2006 JTS 170**; *Morán v. Martí*, 165 DPR ___ (2005), **2005 JTS 116**; *Quiñones López v. Manzano Pozas*, 141 DPR 139, 165 (1996).

## Dictamen

Conforme a lo señalado, modificamos para Resolución recurrida para reducir de $22,000.00 a $4,000.00 la cuantía a devolver por el Sr. Ramos al matrimonio Molina-Agostini y para reducir de $6,350.00 a $3,650.00 la partida de daños por concepto de renta. Así modificada, confirmamos el dictamen de DACO, aquí recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones